115 So.2d 586 (1959)
CITY OF MOUNT DORA, a municipal corporation, Appellant,
v.
Gertrude VOORHEES, a widow, Appellee.
No. 888.
District Court of Appeal of Florida. Second District.
October 9, 1959.
Rehearing Denied November 23, 1959.
*588 Sanders, McEwan, Schwarz & Mims, Orlando, for appellant.
Hawkins, Orfinger & Moore, Daytona Beach, Sams, Anderson, Eaton & Alper, Miami, Phillip Goldman, Miami, for appellee.
MURPHREE, JOHN A.H., Associate Judge.
Mrs. Voorhees sued the City of Mount Dora for the wrongful death of her husband while employed by an independent contractor doing work for the city. She recovered a judgment and the city appealed.
The city was engaged in the business of selling electricity which it delivered to its customers over its own distribution system. The city entered into a contract with Jett Construction Company to remove certain electrical lines from the poles along its streets and to replace them with new lines, without interruption of service.
Overhiser, superintendent of utilities for the city, frequented the job during its progress to see that the contract with Jett was faithfully carried out as far as the city was concerned, but he otherwise took no part in directing the work.
At the time Voorhees was killed a line 600 feet in length was being removed. Overhiser was standing near the truck that was to pull the wire from the poles. Close by were Walker and Voorhees, two groundmen of Jett's crew. Griffin, a lineman for Jett, had gone to the far end of the wire to free it from the pole and otherwise make necessary preparations for its removal. When all was in readiness Griffin so indicated by a hand signal to Overhiser who was standing in a position to receive the signal. Overhiser then relayed the signal to Walker and Voorhees by asking Walker to fasten the wire to the truck and Voorhees to drive the truck forward when that was done. On no other occasion, according to the evidence, did Overhiser make any suggestion to Jett's employees concerning their duties in connection with the work being performed under the contract.
In a literal compliance with Overhiser's direction, Walker, who was an experienced electrician, tied the bare wire to the metal bumper of the truck without fastening a rope between to act as an insulator, according to the customary practice of the industry. Walker admitted that he knew it was unsafe to secure the wire to the truck in that fashion and that he had never done so before. From where Overhiser was situated he could not see how Walker fastened the wire to the truck nor did he undertake to tell him how to do it.
In the process of removing the old wire it came into contact with a high tension line and caused a loud explosion. In the excitement which ensued Voorhees alighted from the energized truck and as his foot touched the ground he was instantly killed *589 by the passage of 2,400 volts of electricity through his body.
It is generally recognized that one who engages an independent contractor to perform a job for him, without reserving control and direction of the work, will not become liable for the negligence of an employee of the independent contractor. Mumby v. Bowden, 25 Fla. 454, 6 So. 453. There are, however, two theories upon which the employer of an independent contractor may be held liable in that situation. First, by interfering or meddling with the job to the extent of assuming the detailed direction of it and thus becoming the master of the independent contractor's employee. Second, by committing some act of negligence for which the prime employer would be liable, irrespective of the employer-independent contractor relationship.
It is upon the latter theory that Mrs. Voorhees apparently based her case, for in her brief her counsel say:
"The liability here is not * * * based on the theory that the defendant became the master of the negligent employee of the independent contractor.
"It is only when the defendant, through its agents, servants or employees, negligently interferes with or meddles with the work being done, or it directs the doing of a negligent act, and such action by the defendant results in injury to or death of an employee of an independent contractor, that the defendant is liable."
In her complaint Mrs. Voorhees, in substance, makes the following charges against the city:
1. Negligently interfering in the performance of the contract by assuming direction and control of the method and manner of removal of the old wire.
2. Requiring deceased to pull with a truck an uninsulated line 600' long through limbs of oak trees along the street in close proximity to an energized primary electric line of high voltage.
3. Supplying a city truck with an uninsulated metal bumper for the purpose of pulling out the old wire close to an energized high voltage line.
4. Failing to insulate the energized line next to the old line being removed.
5. Failing to warn deceased of the potential danger involved although the city had knowledge that he was inexperienced in such work.
6. Failing to have lines properly fused so as to cut off the current should a ground or short occur.
7. The city through its agent Overhiser did "specifically instruct employees of said contractor to tie or wrap one end of said uninsulated wire to or around the metal bumper of said truck."
As to the first charge, the city through its agent Overhiser did not assume to direct and control the method and manner of removal of the old wire, as alleged. Mere suggestion as to details of the work by way of cooperation in the undertaking by an agent of the city to an employee of the independent contractor is not enough to change the relationship to that of master and servant, and thus cause the city to become liable for the negligence of the employee of such independent contractor. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, Steinman v. Pennsylvania R. Co., 3 Cir., 54 F.2d 1052, 1053.
As to the second charge, the evidence reveals no causal connection between the death of Voorhees and the existence of trees along the street, or the excessive length of wire being removed.
As to the third charge, the truck furnished by the city was no different from the trucks used for the same purpose by *590 Jett on other jobs. In addition, the proximate cause of the accident was the failure of Walker to fasten a rope between the wire and the bumper of the truck according to customary standards of safety, rather than the failure of the city to furnish a suitable truck. For a discussion of the question of proximate cause and reference to the pertinent Florida decisions see 23 Fla.Jur. 270, sections 25 through 39.
The fourth, fifth and sixth charges are not supported by the evidence.
As to the seventh charge, there can be little question that Walker's act in tying the bare wire directly to the metal bumper of the truck was negligent and resulted in the tragic death of Voorhees. However, in the light of all the circumstances of this case we do not think that the city was liable.
In the first place, Overhiser did not specifically direct Walker to "tie or wrap one end of said uninsulated wire to or around the metal bumper of said truck", as alleged. Walker, who was Mrs. Voorhees' witness at the trial, testified on cross-examination: "He told me to tie the wire, and it was bare".
Overhiser did no more than serve as a link in the chain of command from Griffin to Walker and Voorhees, as an accommodation, by relaying Griffin's signal when all was in readiness for the wire to be removed. He suggested nothing to Walker that Walker was not bound to do under Jett's contract with the city anyway, nor did he undertake to tell Walker how the task should be performed. Walker was never under the dominion or control of the city. Jett's foreman was the person to whom Walker looked for orders and he was bound to obey no one else. Only Jett could dismiss Walker if his services became unsatisfactory.
The city relies heavily upon the court's opinion in the case of Steinman v. Pennsylvania R. Co., supra. The facts in that case are closely analogous to the situation here and we are in accord with the decision from the standpoint of law. In a moment we shall, therefore, quote pertinent portions of that opinion.
In Steinman, the Pennsylvania Railroad Company contracted with New York Foundation Company to construct pier foundations for a bridge. The Railroad reserved the right to inspect the work to insure that it was done according to the contract. In course of the construction Dingsor, a scaffold builder, employed by the foundation company, so layed a runway that it broke and caused Steinman, a fellow employee, to fall and become injured. Steinman sued the railroad company and from a judgment of nonsuit entered his appeal.
One theory of Steinman's case was that the railroad company, through its inspector, so consistently interfered with the employees of the contractor in their work that the independent quality of the contractor's relation to the contractee was destroyed, and its servants generally became the servants of the contractee. The court found, however, that the evidence did not support this theory of the case.
Steinman's other theory of recovery arose out of an alleged interference by a Railroad inspector with one of the Foundation Company's workmen, on the occasion of Steinman's injury.
Dingsor, the employee of the independent contractor, was required among other things to construct scaffolding and runways. In this he was skilled. Earl, an inspector for the Railroad, complained that the job was being delayed for want of a runway to make ready a certain caisson. Dingsor replied that proper scaffolding planks, 4 x 10's, were some 1,000 feet away, and that the only ones close by were 2 x 10's which had been used, were knotty and grainy, and therefore unfit. Dingsor testified that Earl told him to go ahead and use the 2 x 10's. Earl left the scene and Dingsor proceeded to lay the runway, using two 2 x 10's side by side. Steinman in the course of his work started across the runway. *591 One of the planks broke under his weight and he fell and was injured.
In discussing the effect of the testimony the court said [54 F.2d 1053]:
"Whether this constituted interference with the work of the contractor's servant so as to make him the servant of the contractee must be determined by the tests which the law provides in such a case. The mere fact that Dingsor, servant of the contractor, was sent to do work pointed out to him by Earl, servant of the contractee, does not make him the contractee's servant; `more than that is necessary to take him out of the relation established by the only contract which he has made and to make him a voluntary subject of a new sovereign  as the master sometimes was called in the old books.' Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922.
"This something more than mere direction is, as stated by the authorities, the assumption by one party to a contract to do work through a servant of the other party. Whether there is such assumption and change of masters and a corresponding change of liability depends upon whose work is being performed, `a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work.' * * *"
The Court goes on to say:
"Power of direction and control remain in the original master so long as he `retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, "not only what shall be done, but how it shall be done,"' * * *. But when another assumes the power to control and direct the servant of the original employer to do certain work which may be within the scope of his employment and to do it by the method or in the manner he shall prescribe, he assumes control over the servant and substitutes his authority for that of the original master and is liable for his own negligence. 39 C.J. §§ 151, 1560; 44 A.L.R. 967, § 10.
"* * * Laying the runway was work which the contractor had undertaken and was unquestionably within the scope of its servant's employment. Therefore the inspector of the contractee in directing him to lay the runway did not take the servant from his regular work and set him to an outside task. He told him to do nothing more than he should do for his own master, but to do it promptly. The direction was not compulsory upon Dingsor for it was given by one who had no power to control him in its observance or discharge him for disobedience. The direction, on first appearance, was purely supervisory, having for its object the co-ordination of the work in the interest of speed. Having been directed to do a thing within the scope of his employment  `get the scaffold ready'  Dingsor could and should have selected planks adequate for the purpose in number and strength. Many thick ones were available a short distance away, and many thin ones were lying all about. If he had done this there would have been no case, and, indeed, there is at present little in the case except for Dingsor's testimony that Earl told him to use the 2 x 10 planks. Assuming this to be true, Earl and Dingsor separated after their conversation. Earl went about some other business and Dingsor, without further direction from Earl, set about the work of laying the runway, which was peculiarly that of his original master, the contractor. He was bound to do it in a workmanlike way with regard to the safety of his fellow-employees. Earl had not told him how to do it; being hired for his skill, he was supposed to know. * * * Nor did he otherwise *592 indicate the manner in which the work should be done. All this was left to Dingsor's judgment and skill, for he was doing what the contractor had hired him to do. When he selected two, and only two, of the 2 x 10 planks out of all of that size immediately available and laid the runway, we hold that he was working under his contract of hire with the contractor and that accordingly the contractor was at that time his master, and was liable for the negligence, if any he committed."
A case more closely in point than Steinman, to the situation here, could hardly be found. At any rate, we have been referred to none.
For the reasons indicated the judgment of the trial court is reversed and this cause remanded for entry of an appropriate judgment for the city.
ALLEN, C.J., and SHANNON, J., concur.