509 So.2d 343 (1987)
CITY OF MIAMI, Lester C. Pancoast, Bouterse Borelli Albaisa Architects Planners, Inc., De Zarraga & Donnell, Inc., Volkert Associates, Inc., United States Fidelity & Guaranty Company, Houston General Insurance Company, and Allan Poms, Appellants,
v.
Mario PEREZ, II, and Hilda Perez Lozada, Appellees.
UNITED STATES FIDELITY & GUARANTY COMPANY, Appellant,
v.
CITY OF MIAMI, Mario Perez, II, Hilda Perez Lozada, Houston General Insurance Company, et al., Appellees.
Nos. 85-2184, 85-2185, 85-2189, 85-2240 and 85-2139.
District Court of Appeal of Florida, Third District.
June 2, 1987.
Rehearing Denied August 12, 1987.
*344 Dunn & Dresnick and Richard M. Dunn and Mark A. Dresnick, Carey, Dwyer, Cole, Eckhart, Mason & Spring and Pamela Beckham, Miami, Richard A. Sherman, Fort Lauderdale, Marlow, Shofi, Connell, DeMahy, Valerius, Abrams, Lowe & Adler and Joseph H. Lowe, Peters, Pickle, Flynn & Niemoeller and Donna C. Hurtak, Miami, for appellants City of Miami, et al.
Stanley M. Rosenblatt, Cooper, Wolfe & Bolotin and Marc Cooper; Robey & Pelstring and R.J. Pelstring, Miami, for appellees Perez and Lozada.
Richard A. Sherman, Fort Lauderdale, for appellant U.S. Fidelity & Guar. Co.
Dunn & Dresnick and Richard M. Dunn and Mark A. Dresnick, Stanley M. Rosenblatt, Cooper, Wolfe & Bolotin and Marc Cooper, Robey & Pelstring and R.J. Pelstring, Marlow, Shofi, Connell, DeMahy, Valerius, Abrams, Lowe & Adler and Joseph H. Lowe, Miami, for appellees City of Miami, et al.
Before HENDRY, DANIEL S. PEARSON and JORGENSON, JJ.
HENDRY, Judge.
This is a consolidated appeal by the City of Miami (City) and its insurers, United States Fidelity & Guaranty Company (USF & G) and Houston General Insurance Company (Houston) concerning a construction site accident which occurred during the building of the City of Miami Police Station.[1],[2] Plaintiff Mario Perez was a carpenter employed by the general contractor, ADH, Inc. (ADH).[3] For reasons more fully developed below, we reverse.
Briefly stated, the facts are as follows. Perez's accident occurred on September 16, 1975, while he was dismantling scaffolding in the course of his employment. The metal scaffoldings to be disassembled were stacked one on top of the other to form a scaffold tower with a total height of twenty-two feet. As part of his job, Perez climbed onto the twenty-two foot high scaffold, directing the other worker assigned to him to wait on the ground to protect other workers from falling scaffold sections to be thrown down by Perez. Perez began disassembling the scaffolding by standing on boards provided at the site, lifting scaffolding jacks out of their fitted positions, and throwing them to the concrete surface below. At the time of the accident, the scaffolding had been disassembled so that Perez was standing at a height of twelve feet above the ground.
While standing on a single two by ten inch plank,[4] Perez dislodged and picked up a six foot steel jack, weighing approximately fifty pounds. He testified that he planned to throw this piece to the ground. Perez further testified that as he picked up the jack, he lost his balance and in desperation threw it to the ground. The jack, however, hit the bottom brace beneath Perez and kicked up, causing Perez to be knocked off his plank onto the ground. Perez was paralyzed as a result of his fall.
On November 25, 1975, Perez, and his former wife, Hilda Lozada, sued the City as owner of the property where the accident occurred, the joint venture which provided *345 architectural and engineering services for the premises under construction (Joint Venture),[5] and Allan Poms (Poms), an architect who at the time of the accident was under contract with the City to provide on-site inspection services. The plaintiffs also sued USF & G and Houston, alleging that they provided liability coverage for the City.[6]
In December, 1976, summary judgment was granted for all defendants and plaintiffs appealed. This court reversed and remanded in Perez v. City of Miami, 358 So.2d 1132 (Fla. 3d DCA 1978). The case was then tried in January, 1984, resulting in a hung jury as to defendants' liability. A motion for mistrial was granted. Following the 1984 trial, plaintiffs amended their complaint.
Plaintiffs' second amended complaint alleged that the City owed a duty to Perez because "[i]t was the owner of the project and actively participated in the construction. It therefore owed Mario Perez, II, a duty to provide him with a safe place to work."[7] In an amendment to the second amended complaint, the plaintiffs also alleged vicarious liability against the City and the Joint Venture alleging that defendant Allan Poms was an agent, servant and employee of the City and of Joint Venture.
At the six day jury trial in June, 1985, the trial court denied defense motions for directed verdict at the end of plaintiffs' case and at the close of the evidence. The jury answered special verdict interrogatories finding that the City, the Joint Venture, and Allan Poms were 50%, 20% and 25% negligent, respectively. The jury also found that the City and Joint Venture were legally responsible for the acts of defendant Poms.
The jury found Perez only 5% comparatively negligent. He was awarded $3,250,000. Hilda Lozada was awarded $125,000.[8]
Plaintiffs attempt to hold the City, as owner of the property, responsible for Perez's accident by alleging that the City actively participated in the methods or means used by ADH, during the course of construction, but failed to exercise its right of control in a reasonably careful manner. Secondly, plaintiffs attempt to hold the City vicariously liable through Poms for Perez's accident, contending that Poms was "an agent, servant or employee of the City of Miami acting in the course and scope of his duties."
Therefore, in order to decide whether to impose liability on the City for Perez's accident, it must be determined how much control, if any, the City retained over the construction site. Secondly, it must be determined whether, upon employing Allan Poms, the City had the right to control the details of his movements during his performance of the duties agreed to.
Under Florida law, an owner who hires an independent contractor is generally not liable for injuries sustained by that contractor's employees in their work. Crawford v. Florida Steel Corp., 478 So.2d 855 (Fla. 1st DCA 1985); Van Ness v. Independent Constr. Co., 392 So.2d 1017 (Fla. 5th DCA), review denied, 402 So.2d 614 (Fla. 1981). However, there are two principal exceptions to this rule.
First, an owner may be held liable if he interferes or meddles with the job to the extent of assuming the detailed direction of it, and thus becomes the master of the independent contractor's employee. Conklin v. Cohen, 287 So.2d 56 (Fla. 1973); Cadillac *346 Fairview of Florida, Inc. v. Cespedes, 468 So.2d 417 (Fla. 3d DCA 1985); City of Mount Dora v. Voorhees, 115 So.2d 586 (Fla. 2d DCA 1959), cert. denied, 119 So.2d 293 (Fla. 1960). Second, if the owner has been a passive nonparticipant, in order to impose liability one or more specific identifiable acts of negligence, i.e., acts either negligently creating or negligently approving the dangerous condition resulting in the injury or death to the contractor's employee, must be established. Conklin, 287 So.2d at 60.
As noted in Cadillac, 468 So.2d at 417, an owner has a right to inspect the work of an independent contractor to determine that the work conforms to the contract and to reject unsatisfactory work and demand that it be made satisfactory. Moreover, this reservation is not a usurpation of control and does not change an owner from a passive non-participant to an active participant in the construction. To impose liability on the owner for retention of control over an independent contractor, there must be such right of supervision or direction that the contractor is not entirely free to do the work his own way. Van Ness, 392 So.2d at 1019; Restatement of Torts (Second) § 414, comment (c) (1965).
In the instant case, the plaintiffs' allegation that the City retained control of the construction site is based upon their contention that the City retained the right to "approve methods of construction" before they could become effective. They further contend that ADH had to follow the engineer's suggestions "as to placing the project in the safest possible condition." However, these contentions in and of themselves do not necessarily evidence active participation or control.
An owner has the right to inspect the work of an independent contractor to determine that the work conforms to the contract and to reject unsatisfactory work and demand that it be made satisfactory. As previously stated, reservation of this right, through an owner, is not a usurpation of control and does not change an owner from a passive non-participant to an active participant. Van Ness, 392 So.2d at 1019.
Moreover, this rule is not altered by the fact that the owner-employer may stop work which is not properly done. 41 Am.Jur.2d Independent Contractors § 10 (1968). If, however, the contract provides that the work shall be done "under the direction"[9] and "subject to the approval" of the owner, a closer question is presented, but the general view is that the question is to be determined from all the provisions of the contract together with the surrounding circumstances, and that such a provision does not necessarily make the contractor a mere servant. Id.
As noted in 41 Am.Jur.2d Ind.Contr. § 10, an owner who engages an independent contractor to perform a job for him may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract  including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work  without changing the relationship from that of owner and independent contractor, or the duties arising from that relationship.
Thus, an employment contract is nonetheless independent in its character because it contains stipulations to the effect that the work is to be done "in accordance with instructions" from the owner-employer, or under the supervision of the owner's agent, or as the owner may direct.[10] 41 Am.Jur.2d Ind.Contr. § 10.
*347 Plaintiffs further allege that the City "actively participated" in the construction because it utilized an on-site inspector (Poms) to observe the progress of the work, and this on-site inspector had the right to enforce the contractual provisions requiring the contractor to be responsible for the safety of the workplace.[11]
What has to be determined now is whether Poms exercised enough control over the construction to impose liability upon the City. Poms' testimony concerning his activities was uncontroverted. He testified that he was on the job exclusively to observe the quality of the materials and to observe the workmanship employed by the contractor in order to assure compliance with the plans and specifications. He stated that one of his duties was to inspect and make observations of the work in progress.
Poms further testified that he did not have any responsibility for supervising or inspecting any safety activities of the contractor. The contractor was responsible for the means and methods of construction and for safety and Poms was not involved with monitoring the contractor's safety procedures. Poms testified he was not aware of the scaffold disassembly procedure utilized by Perez.
Poms also testified that he had no authority, on the job, to direct or influence any workers of ADH. Nor did he have any authority to go to an employee of ADH and tell him what to do or how to do his job, nor to hire or fire employees of ADH.
Poms did testify, however, that one of his duties was to be aware of official visitors to the site, and keep track of the different inspectors who routinely visited the site. He supervised these inspectors when they came to the job. He also attended weekly meetings with the various responsible parties within the police department who were involved with activities related to the construction and advised them on the progress of the work.
Poms further testified that he did not think his contract gave him the power to stop the job  he would have to get in touch with the architect-consultant and then get his authorization before he could take such an extreme action. This was because his contract stated that he was working under the supervision of the architect-consultant.[12]
Several Florida cases support the City's allegation that an owner will not be responsible for a contractor's safety violations in situations where an owner's representative was present at the construction site for the purpose of assuring that the contractor complied with the plans and specifications for the construction. Skow v. Department of Transportation, 468 So.2d 422 (Fla. 1st DCA 1985); Coudry v. City of Titusville, 438 So.2d 197 (Fla. 5th DCA 1983); Van Ness, 393 So.2d at 1017; Vorndran v. Wright, 367 So.2d 1070 (Fla. 3d DCA), cert. denied, 378 So.2d 350 (Fla. 1979).
These cases recognize that the presence of an on-site inspector representing the owner's interest does not mean that the owner is actively participating in the construction to the extent that he directly influences the manner in which the work is being performed. These cases also imply that the existence of an owner's contractual right to require its contractor to comply with safety regulations does not impose a duty upon the owner which makes the owner responsible in the event that a contractor does not provide his men with a safe *348 workplace. Vorndran, 367 So.2d at 1071 (It is generally the prime responsibility of the contractor-employer to comply with safety regulations. § 440.56, Fla. Stat. (1971)).
In Skow, 468 So.2d at 422, Capelletti Brothers was under contract with the DOT to construct a bridge. Skow, an employee of Capelletti Brothers, was working high above the river without a safety belt, in violation of safety rules, when he lost his footing and sustained personal injuries. The plaintiff alleged that DOT owed him a duty to eliminate unsafe working conditions of which DOT had actual or constructive knowledge. He also alleged that a legal duty arose because DOT assumed such detailed control over the work that the Capellettis' independent contractor relationship with DOT ceased to exist.
Additionally, plaintiff asserted that Skow's work was inherently dangerous, that he was allowed to work without a safety belt, and that DOT breached its duty to enforce the requirements of the Capelletti/DOT contract by failing to require Capelletti to provide bridge workers with safety belts. The evidence in Skow established that a DOT representative was present at the job site on a continuous basis up to, and at the time of, the injury. As in the instant case, the construction contract required that "Capelletti would comply with all applicable state and federal law governing safety and provide safeguards and safety equipment for its employees." The contract also gave DOT the authority to shut down the job site for Capelletti's breach of this requirement. Nevertheless, the court held that DOT was not liable for failing to correct the safety violations of its contractor. Furthermore, the court held that there "is no indication in the record that DOT, as owner, created or contributed to the dangerous condition alleged to have caused plaintiff's injuries." Id. at 424.
In Van Ness, 392 So.2d 1017, a construction worker suffered injuries while working on a scaffold. The contract between the owner and the contractor contained a clause which stated that "[t]he work included in this contract is to be done under the direction of the Owner or Owner's representative." 392 So.2d at 1018. The plaintiff argued that by this clause, the owner, Sears, retained control of the work and was an active participant in the construction to the extent that it directly influenced or had the right to influence the manner in which the work was performed.
The court held that Sears extended virtually no supervision to the construction. Moreover, the court stated that "appellant's contention of a possibility of interference is speculative and is not sufficient to create a factual issue [and that] this principle is not altered by any showing that the contractor was behind schedule and the owner was insisting that the building be completed on time." 392 So.2d at 1020 (emphasis in original).
And in Coudry, 438 So.2d at 200, the court held that:
The fact that the city in this case had an employee whose duty it was to inspect the work of the independent contractor to see that the city got the performance that the city was entitled to receive under its contract is exactly analogous to the position of Sears, Roebuck and Company in Van Ness.... Here, as in Van Ness, the mere right of an owner (the city here) to inspect to determine that the work conforms to the contract did not change the owner (the city here) from a passive nonparticipant to an active participant in the construction with that right of supervision over, or direction of, the manner in which the work is performed that destroys the independent status of the contractor and renders the owner liable for negligence occurring in the performance of contracted work.
Therefore, participation in construction involves actual involvement in directing the construction methods utilized by the contractor. For example, in Cadillac, 468 So.2d at 417, an action was filed against an owner/general contractor (Cadillac) by an *349 employee of an independent contractor injured on a job site. There the court held for the injured worker. The record in that case disclosed that Cadillac had a staff of field supervisors who oversaw, directed and coordinated the construction project. Moreover, the superintendent made daily progress reports to Cadillac and also sometimes became physically involved in the construction.[13]
Additionally, Cadillac obtained the necessary permits for the construction. Cadillac, as the owner and general contractor, had a duty to keep its premises safe for all workmen on the job. See Lewis v. Sims Crane Service, Inc., 498 So.2d 573 (Fla. 3d DCA 1986) (owner/general contractor can be held liable for injury on construction site and that liability does not depend on active participation), review dismissed sub nom Greenwich, Ltd. v. Lewis, 503 So.2d 327 (Fla. 1987). But cf. Life from the Sea, Inc v. Levy, 502 So.2d 473 (Fla. 3d DCA 1987) (although an owner of a construction site ordinarily has no duty to provide a safe place for an independent contractor to do his work, there is a recognized exception that such a duty will arise when the owner actively supervises and directs the construction work).
In the instant case, the City's Director of Public Works was the city official responsible for administering the contract relating to the construction of the police station. He testified that the City never told the contractor the methods to be utilized by the contractor in constructing the police headquarters. Allan Poms also testified to that effect.
Plaintiffs next look to Poms' contract with the City to establish that Poms was responsible to assure the contractor's compliance with safety procedures. However, the provisions in Poms' contract[14] with the City are similar to the contractual provisions described in Swartz v. Ford, Bacon & Davis Constr. Corp., 469 So.2d 232 (Fla. 1st DCA 1985). There the court held that "[u]nless the contract herein imposes upon Ford a duty and responsibility to supervise and/or control the actual method of construction utilized by B.E. & K., it cannot be held liable for that contractor's failure to comply with required safety regulations." 469 So.2d at 233.
Furthermore, the court went on to say that "Ford's contractual duties are clearly stated in Article II of the contract, and do not specify or imply a duty to supervise or control construction contractors' work... . Article X relied on by Swartz clearly requires only that Ford's services comply with applicable codes." Id. at 233; see Vorndran, 367 So.2d at 1071 (where an architect's contract only obligates the architect to visit the construction site to verify that construction is in accordance with drawings and specifications, the architect cannot be held liable to an injured employee of a subcontractor due to a failure of the contractor to comply with required safety regulations).
Therefore, it is important to discuss Poms' contract with the City. Poms testified at trial that as far as he was concerned, he was not hired to inspect the safety conditions ADH was using. In fact, he testified that the word "safety" did not appear in his contract.[15]
*350 Poms testified that his responsibility was to inspect, to look for compliance with "the plans and specifications, that they are using the right materials and the right place. The progress, general overall progress of the work, and what they are doing on a daily basis."
Poms further testified as to his contract. With respect to the last section of the contract which read, "The responsibilities of the resident engineer do not alter or supercede the liabilities of the contractor or contractors or consultant," Poms answered that his understanding of the meaning of that language was "[t]hat the responsibilities they had under the contract with the City were primary and that whatever my job duties were under this contract did not supercede what they were required to do."
Plaintiffs next argue that the City should have known of the dangerous methods of dismantling scaffolding used on the job, and did nothing to prevent or correct them even though it should have foreseen the likelihood of serious injury if these unsafe practices were not stopped.
Testimony at trial indicates that neither the City nor Allan Poms was aware of the methods used by the construction workers. However, testimony at trial did indicate that the supervisory personnel of ADH knew it was dangerous to throw scaffolding. The plaintiff's foreman (Jim Frank), and ADH's safety director (Frank Leppo), were aware prior to the plaintiff's accident that it was a dangerous procedure that the construction crew were utilizing.
Several Florida cases cited by the City stand for the proposition that an owner has no duty to warn every employee of an independent contractor concerning a dangerous condition if supervisory personnel of the independent contractor are aware of the danger. Horton v. Gulf Power Co., 401 So.2d 1384 (Fla. 1st DCA), review denied, 411 So.2d 382 (Fla. 1981); Lake Parker Mall, Inc. v. Carson, 327 So.2d 121 (Fla. 2d DCA 1976), cert. denied, 344 So.2d 323 (Fla. 1977); cf. Florida Power & Light Co. v. Robinson, 68 So.2d 406, 411 (Fla. 1953) (a property owner has no duty to warn individual employees of an independent contractor if he has given notice to supervisory personnel of the independent contractor).
After having reviewed the record and testimony, we conclude that there was no retention of control by the City over the construction site (so as to impose liability). We further conclude that Poms was not negligent in carrying out his duties as an on-site inspector. Therefore, there is no basis for vicarious liability of the City. Since we hold that the City is not vicariously liable, it is not necessary to reach the related issue raised on appeal whether Poms was an employee or an independent contractor.
Based upon the foregoing reasoning and the authorities cited, we hold that the City, as owner of the construction site, was not liable, under any exception, to Perez. We therefore hold that the trial court committed reversible error in denying the City's motion for a directed verdict. Upon remand, we direct the trial court to enter a judgment of no liability in favor of the City. Furthermore, in view of our holding, USF & G and Houston are not liable to Perez, as the insurers of the City.
Due to our holding, it is not necessary to address the other issues raised in the consolidated appeals.
Additionally, our holding that USF & G and Houston are not liable to Perez renders moot the severed appeal, Case no. 85-2139, which raised the issue whether the insurer was entitled to additional discovery.
Reversed and remanded with directions.
NOTES
[1] Although other defendants appear as appellants in the style of the consolidated appeals, they are no longer interested in the outcome.
[2] The appeal in Case no. 85-2139 was severed from the consolidated appeals, but will be treated herein at the conclusion of our discussion of the consolidated appeals.
[3] ADH was not a party to this litigation by virtue of its immunity from suit under the Workmen's Compensation Statute, Section 440.11, Fla. Stat. (1975).
[4] Although there were initially two boards at the twelve foot level, Perez removed one of the planks used to provide stable footing in disassembling the scaffolding and repositioned the one remaining plank between the two end jacks.
[5] The Joint Venture was comprised of defendants Lester Pancoast, Bouterse Borelli Albaisa Architects Planners, Inc., De Zarraga & Donnell, Inc., and Volkert Associates, Inc.
[6] Houston is an excess carrier providing coverage above USF & G's limits.
[7] Although the complaint also alleged that the City owed the plaintiff a second duty because it was his employer under the Occupational Safety and Health Act ("OSHA"), this allegation was waived based upon a specific statutory definition which provides that municipalities are not considered OSHA employers. 29 U.S.C. § 652 (5).
[8] On appeal, plaintiffs argue that appellants do not challenge the award to Hilda Lozada. However, a wife's loss of consortium claim for her husband is derivative and dependent upon her husband's stating a cause of action. Habelow v. Travelers Ins. Co., 389 So.2d 218 (Fla. 5th DCA 1980).
[9] ADH Contract Documents  Excerpts of Special and General Provisions p. 13, Sec. 6-5:

All work done or materials furnished are to be subject to the acceptance or the rejection of the [City's] Engineer ... and see sec: 6-8. Inspectors.... No work shall be done without suitable supervision or inspection by the Engineer or his representative.
[10] But note that in some jurisdictions, stipulations identical or virtually identical to those stated above have been construed by the courts as reserving to the employer that full control over work performed which places him, with relation to the person employed, in the position of master. 41 Am.Jur.2d Ind.Contr. § 10.
[11] In his testimony at trial, Lester Pancoast (architect) referred to Poms as the "Clerk-of-the-Works." "`Clerk-of-the-Works' and its contemporary successors, `resident inspector' or `project representative' refer to a person selected by the owner and architect, although paid by the owner, to provide continuous supervision when required by the owner." Cutlip v. Lucky Stores, Inc., 22 Md. App. 673, 325 A.2d 432, 434 n. 3 (1974).
[12] Poms' contract reads:

(c) The RESIDENT ENGINEER [Poms] will be strictly under the supervision of the CONSULTANT [Pancoast] for the Miami Modern Police Headquarters Building, and the parking garage and site development work.
[13] In the instant case, although Poms kept a daily log, the record is devoid of any evidence that he became physically involved in the construction.
[14] The applicable provisions in Poms' contract read:

1. The RESIDENT ENGINEER shall carry out this work with all applicable dispatch in an economical, efficient and professional manner. The provisions of all applicable Federal, State and local laws must be met; and
2. The RESIDENT ENGINEER will be completely and fully responsible to the CONSULTANT for the inspection of construction to be performed in accordance with the plans and specifications and with the existing laws and codes applicable to the construction of these two buildings and site development work.
[15] Poms' contract provided:

WHEREAS, the City desires to engage the services of a RESIDENT ENGINEER for the day to day inspection and supervision of these two buildings and the site development work... .