660 So.2d 1093 (1995)
INDIAN RIVER FOODS INC.; Becker Groves Inc.; and Becker Holding Corporation, Appellants,
v.
William Keith BRASWELL and Tabetha Braswell, as Personal Representatives of the Estate of Terry Wayne Braswell, deceased, Appellees.
No. 94-1783.
District Court of Appeal of Florida, Fourth District.
August 23, 1995.
Rehearing Denied October 10, 1995.
*1094 Joseph S. Kashi of Sperry, Shapiro & Kashi, P.A., Fort Lauderdale, for appellants.
William S. Frates, II, of William S. Frates, II, P.A., Vero Beach, for appellees.
FARMER, Judge.
We are asked by this appeal to decide whether a claim by the injured employee of an independent contractor against the owner of the facility at which the contractor was employed should have gone to the jury. We conclude that there is no evidence in the record to support a finding of liability and reverse the denial of the owner's motion for judgment in accord with its prior motion for directed verdict.
Indian River Foods (owner), a subsidiary of Becker Holding, owns a citrus processing plant in Fort Pierce, Florida. Owner contracted with Gulf Machinery Company (Gulf) for the construction of certain improvements and expansions to its citrus plant designed to increase production. The improvements included the design, construction and installation of a feed mill and a number of tanks. This work was designated in section 7 of the contract. At the time of the accident, the work for that section had been billed and paid and the feed mill area had been operational for about 6 months  even though only about half of the required tanks had been *1095 installed and there were still problems in other parts of the plant.
The feed mill chops, presses, and dries orange peels, turning them into livestock feed. The process results in a liquid known as "press liquor" which is composed of sugar, water, and a flammable oil known as "d'limonene." The components of the press liquor are separated in an evaporator. Pipes from that evaporator lead to various tanks. In those tanks, sugars are produced into molasses; water is stored and used to clean the plant; and d'limonene is separated from the water and sold. The water is stored in a condensate water tank, and the d'limonene is stored in a separate tank. Gulf designed, built and installed these tanks, including their pipe fittings.
The process for separating the water from the d'limonene is imperfect, and d'limonene can drain into the condensate water tank rather than its own tank. If the separating process is working well, only trace amounts of d'limonene will be found in the water tank. There was a condensate water tank in the feed mill area. The tank was closed and had a foot-long, 2" diameter drain pipe near the top, with a covered manway for maintenance. The purpose of the drain pipe was to allow rising water to escape from the closed tank.
As originally designed and built by Gulf, the excess water would flow from the drain pipe down to the ground below. Because that situation was unsatisfactory, however, Gulf was required to modify the overflow design. Accordingly, two Gulf employees were instructed to extend the protruding pipe over to another tank where the excess water could be stored.
It was undisputed at trial that, at the time of the incident, the water tank was not marked in any way to indicate that it contained hazardous or flammable material. Before the modification had been effected, owner's inspector told Gulf's supervisor that the 2" diameter pipe as originally designed was insufficient and that a 3" diameter pipe should be used. Gulf's supervisor delegated the task to the same two Gulf employees.
Gulf's supervisor testified that he did not know that the tank contained d'limonene, or that no cutting should be done on the tank without venting or flushing first. He also claimed not to know that d'limonene would be found in the water in the evaporator tank as a natural consequence of the production process. He thought that the d'limonene went into a separate tank. Before lunch, the supervisor spoke to the two Gulf employees about changing the size of the pipe. The two employees returned to the condensate tank after lunch to make the change.
One of owner's employees assisted the two Gulf employees in getting their equipment up on the bridge of the tank. Another one of owner's employees controlled the evaporator and the water levels in the tank. One of the two Gulf workers asked him to lower the water level in the tank so that the hot water would not splash on them when they cut the tank. Owner's employee lowered the water level and then switched the valve on the evaporator to get molasses back. As an expert later testified, the agitation caused by the raising and lowering of the water levels placed the d'limonene-water mixture into the explosive range.
As decedent cut into the surface a big flame shot out of the tank, setting him and the other employee on fire. It blew out the bottom of the tank and rocketed the remainder into the air, with the remnants landing some 50-75 yards away. Both Gulf employees were severely burned by the explosion.
One of owner's defenses was that the accident could have been avoided if the two Gulf employees had vented and purged the water tank before cutting into it. The tank could have been vented by removing the manway cover. It could have been purged by filling the tank up with water to force out the d'limonene vapors, by draining and washing the tank, or by blowing an inert gas through the tank. Decedent did not flush the tank; nor did he vent or purge it because he thought the tank contained water only. Gulf safety procedures instruct, however, that a condensate water tank should always be vented and purged.
The case went to the jury with a stipulation as to the amount of both economic and non-economic damages, and thus the jury was asked to consider liability only. The *1096 jury apportioned fault as follows: decedent 10%; Gulf 70%; and owner 20%. Based on the damages stipulation, the court entered judgment for decedent's estate and against owner for its pro rata share of the agreed damages. Owner timely moved post-trial for judgment in accord with its prior motion for directed verdict. This motion was denied, and owner appeals. We reverse.
The general rule is that an owner is ordinarily not liable for work injuries to employees of an independent contractor. Florida Publishing Co. v. Lourcey, 141 Fla. 767, 193 So. 847 (1940); Lake Parker Mall, Inc. v. Carson, 327 So.2d 121 (Fla. 2d DCA 1976), cert. denied, 344 So.2d 323 (Fla. 1977). One exception is that the owner has a duty to warn employees of an independent contractor of potential danger when the owner has actual or constructive knowledge of a dangerous condition on his premises. Florida Power & Light Co. v. Robinson, 68 So.2d 406 (Fla. 1953); Lake Parker Mall, 327 So.2d at 123. Under this exception, if the owner of the property knows of a dangerous condition that the employees are likely to encounter, the owner must either give warning of, or use ordinary care to furnish protection against, such dangers to the employees of the contractor who lack actual or constructive knowledge of the hazards. Florida Power & Light Co. v. Robinson, 68 So.2d at 410-11.
The duty to warn of the dangerous condition is sufficiently discharged if the owner gives appropriate notice to the independent contractor's supervisory personnel. Mozee v. Champion Int'l Corp., 554 So.2d 596 (Fla. 1st DCA 1989), rev. denied, 564 So.2d 487 (Fla. 1990); City of Miami v. Perez, 509 So.2d 343 (Fla. 3d DCA), rev. denied, 519 So.2d 987 (Fla. 1987); and Lemen v. Florida Power and Light Co., 452 So.2d 1107 (Fla. 5th DCA 1984); Lake Parker Mall, 327 So.2d at 123.
The evidence here is undisputed that top officials at Gulf were not only aware of the problem but were trying to remedy it. Gulf's CEO, David Walker, knew that d'limonene would sometimes get into the water tanks. He said that Gulf employees were aware of this fact from working at different jobs and from Gulf's safety program warning that d'limonene was to be found in a number of places. He said that one of the two employees knew that there was d'limonene in the areas around the feed mill and in the extractor area. Other top personnel at Gulf, including the head of Gulf's service department and Gulf's troubleshooter, were aware that d'limonene could and did leak into water tanks.
In fact there was testimony that Gulf was in the process of fixing that very problem. They knew that d'limonene was getting into the water tank because they were continuously replacing valves dissolved by chemical reaction of the d'limonene. Several testified that they could not understand why they were unable to get the d'limonene out of the tank. We also note the testimony that Gulf's troubleshooter determined after the accident that the d'limonene leak was caused by a defect in a piece of equipment designed, constructed, and installed by Gulf.
In a number of the cases we have previously cited, the party warned was in fact the on-site supervisor of the injured employee of the independent contractor. In Mozee the on-site superintendent of the independent contractor knew of the condition resulting in the death of the employee. 554 So.2d at 596. Likewise, the owner in Lemen was found to have discharged its duty to the employee of an independent contractor who was burned by a live wire because it was undisputed that the injured employee's supervisor knew that the wires were live. 452 So.2d at 1108; see also Horton v. Gulf Power Co., 401 So.2d 1384, 1386 (Fla. 1st DCA), rev. denied, 411 So.2d 382 (Fla. 1981) (independent contractor's supervisors had knowledge equal or superior to employee and knew dangers from overloading).
Plaintiff extrapolates a rule from these cases requiring the owner to warn the on-site supervisor in order to discharge its duty. He argues that it was not sufficient that owner make Gulf's highest officials aware of the problem; rather, plaintiff insists that the warning had to go to the employee's immediate supervisor on the scene. We perceive this conclusion to be a leap of logic with a missing premise. None of the cited cases *1097 deal with the facts here, where upper management of the independent contractor has been warned but the immediate supervisor has not.
In Lake Parker Mall, the court expressly held that the owner discharged the duty to warn by giving notice to "the principals" of the independent contractor. There, the independent contractor (M & M) was doing electrical work for a shopping mall when one of its employees was injured by an explosion on the switchboard he was repairing. In addition to evidence showing that the employee himself knew that the switchboard lacked an important safety switch at the time of the accident, the court found a discharge of the owner's duty to warn from "undisputed evidence that the principals of M & M had been notified." Lake Parker Mall, 327 So.2d at 123. The court further explained:
"In fact, Maze, one of the principals in M & M learned of this malfunction several weeks prior to the accident. Ritter, who was supervising the operation at the time of the accident testified that he was knowledgeable about the defective switch. Moreover, meters had been installed previously on the same switchboard by M & M despite their awareness of the defective switch."
327 So.2d at 123-24.
In this case, the evidence is equally without contradiction that owner had informed Gulf's management of the risk. We conclude that notice to management at the highest levels of a corporate independent contractor satisfies an owner's duty to warn of dangerous conditions. As a matter of law in regard to the discharge of owner's duty, Gulf's supervisor was charged with knowing what his management knew. Thus, this exception to the general rule of owner non-liability is not supported by the evidence.
There is a second exception to the general rule of owner non-liability to the effect that "an owner may be held liable if he interferes or meddles with the job to the extent of assuming detailed direction of it, and thus becomes the master of the independent contractor's employee." City of Miami, 509 So.2d at 345-346. The notion here is that the meddlesome owner forfeits his immunity from liability under the general rule by so insinuating himself into his independent contractor's performance of the contract that the performance becomes his own.
We note that under the contract here owner was expressly prohibited from interfering with Gulf's work. Owner argues therefore, as a matter of law its conduct as established by plaintiff's evidence cannot be a predicate for liability, citing St. Lucie Harvesting v. Cervantes, 639 So.2d 37 (Fla. 4th DCA), rev. denied, 642 So.2d 1362 (Fla. 1994), a recent personal injury case from this court involving the citrus industry.
In that case, the owners hired an independent contractor to pick fruit from owner's trees, which involved taking fruit to the end of the grove where another contractor would transport it to a processing factory. One of the independent contractor's employees was injured while driving a fruit-loaded "goat" from one grove to another. His suit against the grove was predicated on a contention that the owner's foreman directed the injured employee to take the loaded goat to the next grove without making sure that the goat was unloaded before he made the trip. Loaded goats are more likely to roll over than unloaded ones. The employee argued that, if a truck had been at the end of the grove, he could have unloaded the goat before venturing to the next grove, and the accident would have been thereby avoided.
The jury returned a verdict for the employee. The owner appealed, arguing that the evidence failed to show that it was participating in the details of the work in such a manner that it would be liable to an employee of an independent contractor. We agreed with the owner and reversed the employee's judgment, explaining:
"Nor were defendants exercising any control over the manner in which this crew was performing its work. Defendants' foreman told the independent contractor's foreman when the crew had picked enough fruit at one grove, and where the crew should begin picking thereafter, but exercised no control over how the crew got to the next grove, what equipment was used, what route the crew took, how fast the *1098 crew went, or who drove the goat. The goat, which was allegedly dangerous, was owned by the independent contractor, not the defendants. The plaintiff, who was not experienced in driving the goat on the highway, was told to drive the goat by the foreman of the independent contractor, not the defendants." [c.o.]
639 So.2d at 39-40.
The question here relates to how much interference or meddling is necessary for the owner to forfeit his immunity. Both parties compare and contrast our facts to those in Cervantes in support of their respective positions. In Cervantes we said:
"the grove owners exercised no control over the independent contractor other than to direct the independent contractor in regard to the amount of fruit to be harvested and from which grove. The grove owners had no control over what equipment was used by the independent contractor, how that equipment was used or by whom it was used."
639 So.2d at 40. Hence, to agree with owner we must be able fairly to liken the request of the owner's inspector here to the grove owner's request to direct the harvester where and how much fruit to pick.
To our eyes, there is little to distinguish the two cases. The record discloses that, although owner's inspector requested that the size of the pipe be changed, he did not direct Gulf's employees how or when to change it; nor did he instruct on the means or method for accomplishing that goal. All the owner did was to indicate that the size of the pipe was insufficient for the intended purpose without directing how and when the pipe might be replaced. Gulf had sole responsibility under the contract to devise and construct the change.
We cannot say that in this instance the owner's conduct was any more meddlesome than the grove owner's actions in Cervantes. Gulf and its employees were just as free to change the pipe in their own way as the goat driver was to move the goat his way. Where, as in this case, the owner's conduct is limited to its right under the contract to accept or reject the performance of the independent contractor as either conforming or non-conforming to the contract, it would ill serve the general rule to impose liability on the owner.
Indeed, if the act here could be considered meddling, it is easy to foresee a host of "rejection of performance" acts by the owner that would end the general rule of immunity, thereby allowing the exception to consume the rule. The City of Miami court explained:
"an owner who engages an independent contractor to perform a job for him may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the contract  including the right to inspect, to stop the work, to make suggestions or recommendations as to the details of the work, or to prescribe alterations or deviations in the work  without changing the relationship from that of owner and independent contractor, or the duties arising from that relationship." [e.s.]
509 So.2d at 346. See also Van Ness v. Indep. Constr. Co., 392 So.2d 1017 (Fla. 5th DCA), rev. denied, 402 So.2d 614 (Fla. 1981) [citing Restatement of Torts (Second), § 414, comment (c)]; Juno Indus., Inc. v. Heery Int'l, 646 So.2d 818 (Fla. 5th DCA 1994) (evidence did not support claim that owner participated in construction project so as to become responsible for safety of contractor's employees on worksite; owner not liable for injuries suffered by employee when welded pipe came apart during testing; written contract showed that contractor was responsible for safety of workers on site and, although landowner had employees and architects on jobsite to ensure compliance with contract terms, none of owner's employees supervised or attempted to supervise anyone).
We conclude that none of the remaining arguments require comment. There is simply no evidence that would support the application in this case of any exception to the general rule of owner non-liability for injuries to an employee of an independent contractor occurring in work on the owner's property. The verdict finding the owner partially liable should have been set aside.
*1099 REVERSED AND REMANDED FOR JUDGMENT IN ACCORDANCE WITH PRIOR MOTION FOR DIRECTED VERDICT.
GUNTHER, C.J., and KLEIN, J., concur.