427 So.2d 221 (1983)
David DeBOLT, Individually, and As Father and Next Friend of Douglas DeBolt, a Minor, Appellant,
v.
The DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, State of Florida, Appellee.
No. AL-19.
District Court of Appeal of Florida, First District.
February 14, 1983.
Rehearing Denied March 18, 1983.
*222 Stan Trappe, Brian A. Dusseault and Pamela Dru Sutton, Panama City, for appellant.
John A. Bussian, III of Isler, Brown, Smoak, Harrison, Nabors & Bussian, Panama City, for appellee.
ERVIN, Judge.
In this appeal we are asked to determine whether the trial court erred in granting summary judgment in favor of appellee, the Florida Department of Health and Rehabilitative Services (HRS), thus precluding appellants, Douglas and David DeBolt, from proceeding against HRS on a negligence theory. Appellants contend that the trial court erred, first, in finding that HRS enjoys complete tort immunity by operation of Section 402.34, Florida Statutes (1981), and, second, in concluding that no genuine issues of material fact remain in dispute. We agree with appellants on both points and reverse the summary judgment entered below.
In 1978, Douglas DeBolt, then a minor, was placed under the temporary custody of HRS after being accused of committing a delinquent act.[1] Determining that some form of detention was warranted, DeBolt was placed by HRS in the custody of George Martin, a Panama City policeman, whose home had been designated an "attention home"[2] by virtue of a contract entered into by HRS, Martin, and his wife on June 23, 1978.[3] While DeBolt was in the Martins' *223 custody at their home, he was shot in the leg with a .22 caliber rifle by the Martins' three-and-a-half year old son.[4]
A complaint seeking damages on behalf of the minor, Douglas DeBolt, and his father, David DeBolt, alleging negligence on the part of HRS and its agents or employees, the Martins, followed. HRS subsequently moved for summary judgment or judgment on the pleadings on the grounds that: (1) the selection of "attention home" parents was a discretionary, planning level decision for which HRS is immune from tort liability;[5] (2) HRS cannot be vicariously liable for the negligence of "attention home" parents,[6] and (3) HRS is completely immune from tort liability by operation of section 402.34, Florida Statutes. The record shows that the trial court based its decision to grant summary judgment on the second and third grounds raised by HRS, and on that court's conclusion that no material issues remained in dispute.
Appellants first contend that HRS does not enjoy complete tort immunity under Section 402.34, Florida Statutes, which provides:
The department is a body corporate and shall adopt and have a corporate seal. It shall have the power to contract and be contracted with, to sue and be sued in actions in ex contractu but not in torts, and to have and to possess corporate powers for all purposes necessary to administer this chapter. The department shall have the power to accept payment for services rendered pursuant to rules and regulations of the department.
(e.s.) The issue of HRS' sovereign immunity is instead governed, they argue, by Section 768.28, Florida Statutes (1981), which in general terms provides that the State of Florida has "waive[d] sovereign immunity for liability for torts" for itself as well as for "its agencies or subdivisions." They further contend that the court's construction of section 402.34 as authorizing HRS to be barred from an action in tort, when neither the state nor its subdivisions are so exempt, constitutes a denial to them of their rights to equal protection of the laws and access to the courts. HRS responds that the legislature clearly intended that it be excluded from the state's general waiver of sovereign immunity and that section *224 402.34, being a statute specifically relating to its immunity from tort liability must prevail over section 768.28, a statute limiting sovereign immunity only in general terms. We agree with appellants' position on the non-constitutional grounds advanced and reject HRS' claim of complete immunity from tort liability.[7]
Where, as in this case, two statutes are found to be in conflict, rules of statutory construction must be applied to reconcile, if possible, the conflict. We are aided in this task by the maxim that "legislative intent is the pole star by which we must be guided in interpreting the provisions of a law." Parker v. State, 406 So.2d 1089, 1092 (Fla. 1981). In our attempt to discern the legislative intent behind the conflicting statutes, we must consider "the history of the Act, the evil to be corrected, the purpose of the enactment, and the law then in existence bearing on the same subject." State Board of Accountancy v. Webb, 51 So.2d 296, 299 (Fla. 1951). A review of the legislative history of section 402.34, as well as the wording of the statute, convinces us that the legislature's purpose was not to grant unlimited immunity to HRS from actions in tort but rather to provide the then newly created department with the "corporate" powers essential to its functioning.[8] Our interpretation of section 402.34 is consistent with our recent recognition that section 402.34 does nothing more than define HRS' capacity to sue or be sued. See Bergen Brunswig Corporation v. State, Department of Health and Rehabilitative Services, 415 So.2d 765 (Fla. 1st DCA 1982).[9] The lack of a clear legislative intent is certainly not evident from a reading of section 768.28, which exposes the state and its subdivisions to tort claims "in cases where a private person would be liable." See Jetton v. Jacksonville Electric Authority, 399 So.2d 396, 397 (Fla. 1st DCA 1981).[10] *225 The "evil" to be corrected by section 768.28's sweeping changes was unquestionably the prior system of absolute sovereign immunity which denied, to anyone having the misfortune of being injured due to the negligence of a governmental entity or its agents, the right to recover damages for such injuries in court. The obvious inequities of the old system led the Florida Supreme Court to observe that
[i]n our view, section 768.28, rather than denying equal protection, has in fact brought fairness, equality, and consistency to an area of the law which for over one hundred years has been beset with contradiction, inconsistency, and confusion... . Clearly, the even-handed application of immunity under section 768.28 furthers equal protection of the law under our constitution rather than denies it.
* * * * * *
It is our decision that, in this state, sovereign immunity should apply equally to all constitutionally authorized governmental entities and not in a disparate manner.

Cauley v. City of Jacksonville, 403 So.2d 379, 385, 387 (Fla. 1981) (e.s.).
In considering the different legislative purposes behind both statutes, it is next our task to reconcile their conflicts, if possible. We are urged by appellants to find section 402.34 unconstitutional on the grounds of equal protection and access to the courts. We will decline to do so if the relief requested may be granted on nonconstitutional grounds. See, Curless v. County of Clay, 395 So.2d 255 (Fla. 1st DCA 1981). Because we conclude that the conflict between sections 768.28 and 402.34 may be resolved by application of the rule of "implied repeal," we do not reach the constitutional issues presented by appellants. The interpretative rule of "implied repeal," generally stated, means that a
general statute covering an entire subject-matter, and manifestly designed to embrace all the regulations of the subject, may supersede a former statute covering a portion only of the subject, when such is the manifest intent, even though the two are not wholly repugnant.

Sparkman v. State ex rel. Bank of Ybor City, 71 Fla. 210, 71 So. 34, 39 (1916) (e.s.). Mindful that a "repeal by implication is not favored," State v. Dunmann, 427 So.2d 166, 168 (Fla. 1983), we nevertheless conclude that the implied repeal rule is particularly applicable in this case in which a specific statute (section 402.34), purportedly dealing with the sovereign immunity of a particular agency, conflicts with a general statute (section 768.28) that expresses the legislative intent to revise completely the law of Florida regarding sovereign immunity. Our conclusion is particularly influenced by the Florida Supreme Court's decision in Oldham v. Rooks, 361 So.2d 140 (Fla. 1978), wherein the rule of implied repeal was applied to resolve a similar statutory conflict. At issue in Oldham were two statutes, one specific and one general, relating to standards of conduct for public officials and employees. That court refused, as do we, to reach the constitutional issues presented, but instead determined that the more specific statute had been "repealed by implication" by the enactment of Chapter 112, Florida Statutes, which was intended to "deal pervasively with the subject matter of conflict between the official duties and private interests of public officials and employees." Id. at 142. Recognizing the general presumption that the legislature, in enacting a statute, is aware of prior statutes on the same subject, it was nevertheless found that
when the legislature makes a complete revision of a subject it serves as an implied repeal of earlier acts dealing with the same subject unless an intent to the contrary is shown. Orange City Water Co. v. Town of Orange City, 255 So.2d 257 (Fla. 1971); State v. Newell, 85 So.2d 124 *226 (Fla. 1956); Brevard County v. Board of Public Instruction of Brevard County, 159 Fla. 869, 33 So.2d 54 (1947).
Id. at 143. The continuing vitality of the Oldham decision was evidenced by the court's recent opinion in State v. Dunmann, which relied on Oldham in finding that Florida's Anti-Fencing Act, Chapter 77-342, Laws of Florida, which was intended to revise completely the law concerning a broad range of criminal activities, had impliedly repealed section 812.041, the so-called "joy-riding statute." 427 So.2d at 168.
An application of the above principles convinces us that the enactment of section 768.28, a general revision of Florida's law of sovereign immunity, impliedly repealed section 402.34 insofar as it purports to immunize HRS, a particular agency, from tort liability.[11] The trial court's grant of summary judgment, based as it was upon an erroneous conclusion of law, is therefore reversed.
The trial court's determination that no material issues of fact remain in dispute was likewise erroneous and requires reversal. Several areas of factual dispute are suggested and we are persuaded, by the limited record developed at this stage of the proceedings, that a material factual dispute does remain regarding the Martins' status as independent contractors. The decisive factor in determining whether individuals are independent contractors, agents, or employees is of course the degree of control exercised by the employer. See Crawford v. Department of Military Affairs, 412 So.2d 449 (Fla. 5th DCA 1982). If there is no question as to the existence or non-existence of a master/servant or employer/employee relationship, the issue is one then for the court to determine. If, however, the issue is unclear, it becomes a question of fact for the trier of fact to decide based on the evidence presented. See Gregg v. Weller Grocery Co., 151 So.2d 450 (Fla. 3d DCA 1963). In this case, although the Martins are identified in the contract as "independent contractors," the terms of the contract appear to impose a number of conditions and limitations[12] upon them which, at the *227 very least, create a factual dispute as to their status, thus precluding summary judgment.
The trial court's entry of summary judgment is therefore reversed and this case is remanded for further proceedings consistent with this opinion.
MILLS and LARRY G. SMITH, JJ., concur.
NOTES
[1] HRS is authorized, by Chapter 39, Florida Statutes, to take custody of and to detain juveniles, such as DeBolt, who have been accused of committing delinquent acts. See, § 39.03, Fla. Stat. (1981). Such detention may be in a "detention home or nonsecure detention program, including home detention and attention homes...." § 39.01(14), Fla. Stat. (1981) (e.s.).
[2] An "attention home" is defined as "a residence in the community to house one or more, but not exceeding six, children in a physically unrestricting environment, pending adjudication." § 959.001(10), Fla. Stat. (1981).
[3] The contract between the Martins and HRS states that HRS "wishes to provide, through independent contractors, Attention Home facilities separate and apart from its Secure Detention facilities..." and further represents that the Martins' home "has been inspected and approved for these services." In return for compensation at the rate of $8.50 per day, per bed, attention home parents must agree to a number of conditions dealing with the providing of shelter, food and the medical needs of the children in their custody. They must also maintain, and submit to HRS, various reports regarding their charges and are restricted, to some degree, in the manner in which they may care for the children. See note 12, infra.
[4] The facts surrounding the shooting are in dispute. Martin, who was playing Monopoly with DeBolt and another juvenile in his custody, evidently spotted a rabbit in the family garden and brought out a loaded rifle with which to shoot it. The rifle, which was left leaning against the dining room wall, either fell or was discharged by Martin's small son, and the bullet struck DeBolt, causing, it is alleged, serious injury.
[5] Although HRS presented lengthy legal argument on the issue of whether the decision to place DeBolt in the Martin's care was a "discretionary, planning level decision," which would preclude tort liability, the trial court chose not to decide that issue, and it is therefore not before us on appeal. See note 11, infra.
[6] In support of its argument that HRS cannot be vicariously liable for the negligence of its attention home parents, HRS and the trial court relied upon an order entered in the case of Lewis v. State, Department of Health and Rehabilitative Services, ___ Fla. Supp. ___, No. 80-2314 (Fla. 2d Cir.Ct., April 28, 1981). A review of that order, entered by the Honorable Donald O. Hartwell of Leon County, indicates that only Count III of a seven-count complaint was dismissed, thus leaving the other six counts intact. Although we will not comment on the merits of a case which is apparently still pending before the circuit court, we would note that the position taken by HRS, that it can never be vicariously liable for the acts of individuals such as the Martins, is contrary to the clear language of section 768.28 which makes the state, its agencies and subdivisions liable, vicariously to be sure, for tortious acts of its employees or agents while they are acting within the scope of their employment. The fact that vicarious liability is contemplated is further bolstered by the 1981 amendments to section 768.28, which preclude the naming of state officers, employees or agents as party defendants to suits, and provides that the exclusive remedy, in most situations, is an action against the governmental entity. See Ch. 80-271, § 1, Laws of Florida. The obvious issue, whether an employer/employee relationship exists, has not yet been resolved in this case. See note 3, supra.
[7] The issue of HRS' immunity from tort liability has been raised in several prior cases with conflicting results. In an action occurring prior to the effective date of section 768.28, it was held that the department was immune from tort liability. See Loucks v. Adair, 312 So.2d 531 (Fla. 1st DCA 1975). In a later action, occurring after 1973, this court, in affirming a jury verdict adverse to HRS, concluded that section 768.28 had waived sovereign immunity for HRS as well as other state subdivisions. See, Department of Health and Rehabilitative Services v. McDougall, 359 So.2d 528 (Fla. 1st DCA 1978). In 1976, the Florida attorney general was called upon to determine if HRS was immune from potential tort liability relating to the swine flu immunization program. He concluded that the state, by its enactment of section 768.28, had "waived its immunity with respect to tort liability for state agencies including executive departments such as the Department of Health and Rehabilitative Services." 1976 Op. Att'y Gen. Fla. 076-188 (September 10, 1976). Finally, in two recent cases before this court, HRS has not asserted its claimed immunity from tort liability. See, Bergen Brunswig Corporation v. State, Department of Health and Rehabilitative Services, 415 So.2d 765 (Fla. 1st DCA 1982), and Kirkland v. State, Department of Health and Rehabilitative Services, 424 So.2d 925 (Fla. 1st DCA 1983). The only case cited by HRS in which it has been held to have complete sovereign immunity by virtue of section 402.34 is the case of Swain v. Walker, ___ Fla. Supp. ___, No. 80-12326 (Fla. 11th Cir.Ct., August 27, 1981), wherein the Honorable Jack M. Turner of Dade County dismissed a tort action against HRS after concluding that section 402.34 deprived that court of subject matter jurisdiction. We do not find that case, which of course has no precedential value, persuasive.
[8] Section 402.34, first enacted in 1969 as section 409.055 was part of a general effort to restructure Florida's executive branch by, among other things, creating the Department of Health and Rehabilitative Services. See, Ch. 69-106, Laws of Florida. Although that section was renumbered as section 402.34 in 1978, see Ch. 78-433, § 17, Laws of Florida, no substantive changes have been made since its initial enactment.
[9] In Bergen, HRS brought an action in conversion and prevailed in the trial court. On appeal, the corporation first raised the issue of HRS' lack of capacity to sue in tort based on section 402.34. Because that issue was not properly before or considered by the trial court, we declined to consider it on appeal.
[10] Section 768.28 was enacted in 1973 for the purpose of allowing actions "against the state or any of its agencies or political subdivisions for the tortious acts of their employees." Ch. 73-313, Laws of Florida. That section was then amended in 1974 to include "agents" as well as employees. See, Ch. 74-235, Laws of Florida. When confusion arose over whether counties and municipalities were to be included, the section was again amended in 1977 to demonstrate that, in "enacting section 768.28, Florida Statutes, the Legislature clearly intended to make the state, the counties, and the municipalities liable for tort claims in the same manner and to the same extent as a private individual under like circumstances... ." Ch. 77-86, Laws of Florida. Additional amendments have been added to Section 768.28 since 1977 which are unrelated to this issue. See Ch. 79-139, Ch. 79-253, Ch. 79-400, Ch. 80-271 and Ch. 81-317, Laws of Florida.
[11] Our finding that HRS is governed by section 768.28, as are all other governmental agencies in Florida, does not subject it in all cases to tort liability. It is clear that there are two types of sovereign immunity: (1) sovereign immunity for negligent tortious conduct which has been waived by section 768.28, and (2) "official or governmental immunity" which has not been waived. The latter form of sovereign immunity is absolute and attaches to "policy-making, planning or judgmental governmental functions." Department of Transportation v. Neilson, 419 So.2d 1071, 1075 (Fla. 1982) (citing Commercial Carrier Corporation v. Indian River County, 371 So.2d 1010, 1020 (Fla. 1979)). This second type of sovereign immunity was raised by HRS as its first ground for summary judgment before the trial court but, because that court did not decide that issue, it is not before us at this time.
[12] For example, the contract requires the attention home parents to provide twenty-four hour facilities for the children assigned to their care and further provides that the parents must agree to abide by the conditions outlined in the "Non-secure Detention" program manual as follows:

a. To report illnesses or need for medical care for children under their care promptly.
b. To report behavioral problems of children under their care immediately.
c. To refrain from entering into arrangements for care of other children unless agreed to or ordered by the Agent.
d. To secure advanced permission from the Agent or his designated representative of any plans whereby the child would be out of home and out of the County eight hours or more.
e. To accept the removal of the child from the home in accordance with the orders of the Agent or his designated representative.
f. Not to take adults or other children into the home to live without first notifying the Agent, and to report any change of address immediately.
g. Not to make any attempt to indoctrinate the child with a particular religious belief.
h. To keep all information concerning the child and the child's family confidential.
i. To cooperate regarding visits between the child and the child's family as arranged by the Agent or his designated representative.
j. That no expenses shall be incurred in behalf of the child other than those set forth in this agreement without first requesting and receiving the approval of the Agent or his designated representative.