468 So.2d 422 (1985)
Timmy SKOW and Linda Skow, Appellants,
v.
DEPARTMENT OF TRANSPORTATION, Appellee.
No. AW-260.
District Court of Appeal of Florida, First District.
May 1, 1985.
*423 Marilyn Sher, of Law Offices of Neil Chonin, P.A., Coral Gables, for appellants.
Donna S. Catoe, of Peters, Pickle, Flynn, Niemoeller & Downs, Miami, for appellee.
ZEHMER, Judge.
Timmy Skow, an employee of Capelletti Brothers, Inc., was injured while working on a bridge being constructed under a contract between Capelletti Brothers (Capelletti), the contractor, and the Department of Transportation (DOT). Skow was working high above the river without a safety belt when he lost his footing, slipped, and grabbed a pile driver, which crushed his hand. He and his wife, Linda Skow, appeal a final summary judgment for DOT on their claim for personal injury damages. We affirm.
Appellants argue that DOT owed Timmy Skow a legal duty to eliminate unsafe working conditions that it knew or should have known would expose workers to a substantial risk of harm. Notwithstanding the general rule that one who hires an independent contractor is not liable for injuries sustained by that contractor's employees in their work, Van Ness v. Independent Construction Co., 392 So.2d 1017 (Fla. 5th DCA 1981), appellants argue that a legal duty arose because DOT assumed such detailed control over the work that the independent-contractor relationship between DOT and Capelletti ceased to exist. Additionally, appellants assert that Timmy Skow's work was inherently dangerous, that he was allowed to work without a safety belt, and that DOT breached its duty to enforce the requirements of the Capelletti/DOT contract and federal safety regulations by failing to require Capelletti *424 to provide bridge workers with safety belts.
The undisputed facts in the record support the conclusion that although DOT actively participated in the inspection of work done by Capelletti, this was done only to ascertain the results of the work and not to control the method of performance or to insure Capelletti's compliance with safety regulations. DOT provided supervision only in the sense that its inspectors generally observed the work for compliance with the contract. The several instances of specific instruction given by DOT employees to Capelletti's employees constituted general supervision in this sense and did not amount to an exercise of control by DOT that is legally sufficient to take this case out of the general rule of Van Ness, supra.
Although the contract provided that Capelletti would comply with all applicable state and federal laws governing safety and provide safeguards and safety equipment for its employees, and provided that DOT had authority to shut down the job site for Capelletti's breach of this requirement, the contract did not impose an explicit duty on DOT to monitor, inspect, and correct violations by Capelletti. There is no indication in this record that DOT, as owner, created or contributed to the dangerous condition alleged to have caused Timmy Skow's injuries.
Since appellants' cause of action is not predicated on a showing that "the contracting owner by positive act of negligence or negligent omission on his part caused injury" to the independent contractor's employee, Florida Power & Light Co. v. Price, 170 So.2d 293, 297 (Fla. 1964), no duty, delegable or nondelegable, was owed by DOT to Timmy Skow. Ibid.; Conklin v. Cohen, 287 So.2d 56 (Fla. 1973); Van Ness v. Independent Construction Co., supra.
Accordingly, the judgment is AFFIRMED.
MILLS, J., concurs.
ERVIN, C.J., dissents with written opinion.
ERVIN, Chief Justice, Dissenting.
I respectfully dissent. In my opinion, there remains a genuine issue of material fact regarding the issue of the Department of Transportation's (DOT) control over Capelletti.
First, there is testimony that a DOT representative was present at the job site on a continual basis just prior to and at the time of appellant's injury. Second, DOT representatives admitted that they had authority to stop construction at sites if a contractor, including Capelletti, was not abiding by certain specifications. Finally, the following deposition testimony of Timmy Skow clearly places at issue the question of DOT's exercise of direct control on the job site:
Q. Did you ever hear anybody from the D.O.T. give any instructions of any nature to anybody at Capeletti [sic]?
A. Certainly.
Q. What kind of instructions?
A. For instance, driving the piling, they tell you when to stop, you know, they tell you how deep.
Say, for instance, if I am the pile driver in this instance, I look at the pile hammer which is diesel, and you pull the cord to stop it or to kill the diesel, and I look at the D.O.T. man to see when he is ready to have me stop it. It is up to him.
Q. All right. Now, these piles have to be driven a certain depth in order to be in compliance with specifications of the job; right?
A. Yes.
Q. You are saying he would have told you when the specifications of the job had been complied with and they had been driven as far as they were supposed to be?
A. Yes.
Q. Any other instructions he would give you?
A. Well, that is just one instance.
Q. Give me the instances that you can think of.

*425 A. For instance, sheet piling or something, if it is leaning out, it shouldn't be leaning out, he comes by and tells you if it is straight or not.
Q. He tells you if the work you have done is acceptable under the contract?
A. Yes, if it is acceptable or if it is not acceptable. It is up to him. It is his discretion.
Q. Generally, would it be fair to say that the communications from the D.O.T. to Capeletti's [sic] people would have related to the quality of the finished product?
A. Yes.
Q. Can you think of any times that the D.O.T. would have given instructions to Capeletti's [sic] people where the instructions would not have related to the quality of the finished product?
A. Like in the movement of barriers, they describe where to put the barriers. They tell you how fast you can move the barriers.
Let's say, for instance, you are closing a lane of traffic. They will tell you.
Q. Right. Yes. Go on. Movement of barriers, where to put them.
A. What kind of equipment you can have out on the road, they tell you that.
* * * * * *
BY MS. SHER:
Q. Mr. Skow, during the four months that you were out on this bridge project, the one on which you hurt your hand, would people from the Department of Transportation be on that jobsite [sic] on a daily basis?
A. Certainly. There was always at least one.
Q. Did people from the Department of Transportation give you orders or directions directly on that jobsite [sic]?
A. Yes, ma'am.
Q. When they gave you directions, they did not transmit them first to your immediate supervisor, Varallo, but they gave them to you directly?
A. To me directly.
Q. Did they give directions directly to the other people who were working on the jobsite [sic] that you observed?
A. On my crew, they would have; yes.
Q. At times when you were given directions by people from the Department of Transportation, was your immediate supervisor, Lew Varallo, present?
A. Yes. Sometimes. Sometimes not.
Q. Can you give me an average as to what  for what portion of the workday somebody from the Department of Transportation would be present on the worksite [sic]?
A. Probably 80 percent minimum.
Q. Daily?
A. Daily.
Q. Did anybody from the Department of Transportation ever order you directly to remove any piles you had driven?
A. Yes.
Q. And that is in addition to what you had already told Mr. Bloomquist about the other areas of your work that were corrected by somebody from the Department of Transportation?
MR. BLOOMQUIST: Object to the form of the question. You can answer, of course.
THE WITNESS: Yes.
Q. (By Ms. Sher) Such as what? Do you call it the sheet?
A. Sheet pilings.
Q. I don't remember if you mentioned that. Did they ever correct any of your work relative to driving of the H-beams?
A. Not driving the H-beams. I had a piling corrected.
Q. And this was by someone on the jobsite [sic]?
How did you know that these were the Department of Transportation people?
A. They all drive yellow trucks. It says D.O.T. on the side.
In order "[t]o impose liability on ... [DOT] for retention of control over ... [Capelletti], there must be such right of supervision or direction that ... [Capelletti] is not entirely free to do the work ... *426 [its] own way." Van Ness v. Independent Construction Co., 392 So.2d 1017, 1019 (Fla. 5th DCA 1981). Restated, the decisive factor in determining whether an individual has the status of an independent contractor, agent, or employee depends upon the degree of control exercised by the alleged employer. As we observed in DeBolt v. Department of Health and Rehabilitative Services, 427 So.2d 221, 226 (Fla. 1st DCA 1983):
If there is no question as to the existence or non-existence of a master/servant or employer/employee relationship, the issue is one then for the court to determine. If, however, the issue is unclear, it becomes a question of fact for the trier of fact to decide based on the evidence presented. See Gregg v. Weller Grocery Co., 151 So.2d 450 (Fla. 3d DCA 1963).
In DeBolt, we reversed a summary judgment entered in an action for damages brought on behalf of a minor who had been placed in an "attention home" as a result of a contract executed between HRS and the owners of the home. The minor was injured while in custody, suit was brought, and summary judgment entered on the ground, among others, that the home's owners could not be considered employees or agents of HRS, because the owners were designated in the contract as independent contractors. We determined that the lower court should have directed its attention beyond the labels stated in the contract, and focused instead upon the indicia of control actually exercised over the home's operations by HRS. We observed that there were a number of conditions and limitations imposed by HRS upon the operators during the time the child was in their care, "which, at the very least, create a factual dispute as to their status, thus precluding summary judgment." 427 So.2d at 226-227.
Similarly, based on the foregoing testimony in the case at bar, there remain in my judgment unresolved genuine issues of material fact as to the liability of DOT; primarily the question of whether DOT retained control over Capelletti's method of performance on the job so as to constitute active participation "in the construction to the extent that ... [DOT] directly ... [influenced] the manner in which the work ... [was] performed." Conklin v. Cohen, 287 So.2d 56, 60 (Fla. 1973).
I would reverse the summary judgment and remand the case for further trial proceedings.