Marion F. COLE, Personal Representative of the Estate of Deborah D. Eisenhut, Deceased, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 87–3049.

United States Court of Appeals, Eleventh Circuit.

June 10, 1988.

John C. Cooper, Douglass, Cooper & Coppins, Tallahassee, Fla., William K. Jennings, Destin, Fla., for plaintiff-appellant.

Thomas G. Banjanin, Asst. U.S. Atty., Pensacola, Fla., Samuel A. Alter, Asst. U.S. Atty., Jerome A. Madden, Trial Atty., Torts Branch, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant-appellee.

Before TJOFLAT and ANDERSON, Circuit Judges, and MOORE[*], District Judge.

TJOFLAT, Circuit Judge:

This is an appeal from a summary judgment entered in behalf of the United States in a wrongful death suit brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680 (1982). *Cole v. United States*, 651 F.Supp. 221 (N.D.Fla.1986). We affirm.

I.

A.

On February 28, 1980, an explosion occurred in the laboratory of Ordnance Research, Inc. (ORI), an explosives and pyrotechnics manufacturer, and took the life of appellant's decedent, a laboratory technician. At the time, ORI was performing a contract for the United States Army Armament Research and Development Command (ARRADCOM). Appellant claims that ARRADCOM's negligence caused the accident, and she seeks money damages in behalf of her decedent's estate. The following facts provide the context for appellant's claim.

Sometime prior to March 1978, the Army requested ARRADCOM to develop for use in troop training a harmless practice mortar round that would produce a flash and smoke on striking its target. In processing this request, ARRADCOM turned to independent contractors for the development and manufacture of the powder needed to produce the flash and smoke and the fuze required to ignite the powder. ARRADCOM chose Dayron Corporation to make the fuze, and ORI to make the powder.

In March 1978, ARRADCOM asked ORI, which had been doing business with the Army for over a decade, if it would be willing to develop, at its own cost, a smoke powder for use in practice mortar rounds. ARRADCOM told ORI that if it developed the powder, the composition of which would remain an ORI trade secret, ARRADCOM would test the powder and if satisfied with the results of the test would purchase from ORI the powder requirements for the practice rounds.

ORI decided to undertake the project, and by August 1978, after experimenting with nineteen formulations of smoke powder, finally arrived at a compound, called "119A," that it thought would be acceptable. ORI submitted the compound to ARRADCOM for testing, and on August 21, 1978, ARRADCOM gave ORI a purchase order for 1000 cartridges (ordinary shotgun shells) loaded with 119A. ORI filled the purchase order and submitted the cartridges to ARRADCOM for testing. ARRADCOM was not satisfied with the performance of the cartridges and requested ORI to revise its formula. Over the next

[*] Honorable John H. Moore, II, U.S. District Judge for the Middle District of Florida, sitting by designation.

several months, ORI prepared several variations of 119A, called successively "119B, C, D, E, and F," and sent some of them to ARRADCOM for testing.

In testing 119B and C, ARRADCOM found that the compounds emitted a poisonous gas, phosphine, and communicated this fact to ORI. ORI doubted ARRADCOM's finding, but nonetheless developed a new compound, called "119G," and sent it to ARRADCOM. ARRADCOM tested 119G, found that the poison gas problem had been eliminated, and on December 12, 1979, gave ORI a purchase order for 1500 smoke cartridges, 1300 containing 119G and 200 containing 119A, for further testing by ARRADCOM.

Appellant's decedent, Deborah Eisenhut, was a technician in ORI's laboratory. She had handled ARRADCOM's previous purchase orders for cartridges, personally preparing the compound and filling the cartridges with the smoke powder,[1] and ORI gave her the task of handling ARRADCOM's December 12 purchase order. Ms. Eisenhut began processing the order in January 1980, and by February 28, 1980, she had filled most of the 119A and G

cartridges ARRADCOM was purchasing. On that day, at 10:30 a.m., while Ms. Eisenhut was alone in the laboratory loading some cartridges with compound 119G, an explosion occurred, killing her. A fire followed the explosion and destroyed the laboratory.

### B.

Marion Cole, the appellant, is the personal representative of Ms. Eisenhut's estate. Cole filed a claim with the Department of the Army on behalf of the estate, the beneficiaries of Ms. Eisenhut's death under Florida's wrongful death act, Fla.Stat. §§ 768.16–27 (1986), and North River Insurance Company, Inc., ORI's worker's compensation insurance carrier, alleging that ARRADCOM's negligence caused Ms. Eisenhut's death and seeking $10 million in damages. The Department of the Army rejected Cole's claim, and she filed this wrongful death suit in the district court under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680 (1982).[2]

---

**1.** The procedure followed by Ms. Eisenhut to prepare the compound and fill the cartridges was as follows. First, she would begin in the chemical laboratory where she would weigh the compound's ingredients. She would then place the ingredients in a metal container and proceed to the blend building. Next, she would charge a ceramic ball jar with the composition, carefully seal the ball jar, making sure that the jar's lid was clean, place the ball jar on the ball mill turning device, and turn on the ball mill. After thirty minutes, she would take the ball jar off the ball mill, ground herself to the work bench station by using a Wriststat, and then place the ball jar on a grounded Velostat for at least ninety seconds. Next, she would open the ball jar and scoop out, with a metal scoop, 200 to 300 grams of the composition and place it into a metal container. She would reseal the ball jar, and carry the metal container into the laboratory. Again wearing a Wriststat, she would use a metal scoop to remove the composition from the container, weigh out 10.5 gram lots of the composition, and fill each of ten shells with that amount.

**2.** Section 1346(b) provides:
Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Section 2674 provides:
The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

Appellant's complaint[3] is a rambling, "shotgun" pleading,[4] framed in one count. The complaint sets forth every act, whether committed by ARRADCOM,[5] Ms. Eisenhut, her coemployees at ORI, or anyone else, which, in the pleader's mind, may have had a causal relationship to the explosion that produced Ms. Eisenhut's death; the complaint, however, does not state what triggered the explosion. It simply alleges that an explosion occurred on ORI's premises while its employees, Ms. Eisenhut among them, were performing a contract for ARRADCOM that required them to handle certain "ultrahazardous materials or mixtures," and that ARRADCOM is liable for Ms. Eisenhut's resulting death because it was "negligent."

Two theories of liability emerge from a reading of appellant's complaint. The first is that ARRADCOM is responsible for Ms. Eisenhut's death because it contracted with ORI for the production of "ultrahazardous material,"[6] had "superior knowledge" that Ms. Eisenhut would be "exposed" to "inherent and probable danger" "in working with" the material, and "failed to communicate with or warn" Ms. Eisenhut of such danger.

The second theory of liability is that ARRADCOM is responsible for Ms. Eisenhut's death because it assumed ORI's responsibility to provide her a safe place to perform the contract work. We draw this theory from the following allegations of the complaint, which we quote in part and rearrange in numbered paragraphs for purposes of analysis:

1. On December 12, 1979, ARRADCOM, using a purchase order, contracted with ORI for the production of "ultrahazardous material." Because the production of such material would constitute "inherently dangerous" or "ultrahazardous" work, AR-

RADCOM inspected the safety of ORI's production facilities and determined that they were safe before issuing the purchase order. After it issued the purchase order, ARRADCOM monitored ORI's performance of the contract, to ensure that ORI complied with its terms. In addition, ARRADCOM voluntarily assumed ORI's responsibility to provide its employees, including Ms. Eisenhut, a safe place to do the contract work. Thus, if ARRADCOM observed an unsafe condition in the work place, it could order ORI to eliminate the condition or, if necessary, shut down the job.

2. Prior to the accident of February 28, 1980, ARRADCOM knew, or in the exercise of reasonable care should have known, that ORI's employees, including Ms. Eisenhut, were performing the contract work "in a grossly negligent or ultra-dangerous manner so as to expose [them] to threat of serious bodily injury or death." Specifically, ORI's employees:

(a) were performing the contract work and "loading and handling" "ultrahazardous materials and mixtures" "in an unapproved and unsafe working area" and "without the benefit of safety protection," including a shield, in clear violation of "the methods which had been approved for such loading and handling," the Department of Defense Contractors' Safety Manual for Ammunition, Explosives and Related Dangerous Material, and all safety standards prescribed for activity involving such ultrahazardous materials and "mixtures";

(b) "were allowed to handle static sensitive materials in areas which were non-conductive, in containers made of non-conductive materials, and wearing clothing that could be ignited by static discharge from the human body";

---

**3.** This reference, as well as the other references in the opinion to appellant's complaint, is to appellant's amended complaint. This was the complaint before the district court when it granted summary judgment.

**4.** The Federal Rules of Civil Procedure condemn such pleadings. *See* Fed.R.Civ.P. 8(a), (e).

**5.** In this opinion, ARRADCOM refers to the United States of America, the appellee, and to all of the Department of Army personnel implicated in this case.

**6.** The complaint makes no reference to compound 119G, the material involved in the explosion. It is undisputed, however, that the "ultrahazardous material" was compound 119G.

(c) "were allowed to stockpile unsafe quantities of ultrahazardous materials and mixtures at or near the loading [and/or working] area," where "[u]nauthorized and unnecessary personnel were allowed to enter" and "[u]nnecessary and unsafe equipment was placed," "thereby causing the imminent danger of fire and/or explosion"; and

(d) "were allowed to take coffee breaks at or near the loading and/or working area," "where the coffee maker for employee coffee breaks was kept."

3. ARRADCOM failed to eliminate the unsafe conditions set forth in paragraph 2 above, and its failure caused Ms. Eisenhut's death.

The Government, in answering the amended complaint, denied the material allegations of appellant's negligence claim and raised several affirmative defenses, none of which is relevant to our discussion. After the parties engaged in extensive discovery, the Government moved for summary judgment. The court granted the motion, concluding that the record failed to disclose any evidence of negligence on ARRADCOM's part, and appellant lodged this appeal.

## II.

In her complaint in the district court and in her briefs to us, appellant implies that she can recover money damages against ARRADCOM without proving the *cause* of the accident that took her decedent's life; all she needs to prove is that the fatal explosion occurred and that ARRADCOM committed one or more of the acts of misconduct enumerated in her complaint. Appellant apparently believes that such proof would establish causation as a matter of law. Accordingly, ARRADCOM is liable under her first theory of recovery if she shows that it possessed knowledge superior to ORI's that the "ultrahazardous" material, i.e., compound 119G, Ms. Eisenhut was working with at the time of the accident presented a substantial danger to her safety but failed to warn her of such danger—whether or not the warning would have prevented the accident. ARRADCOM is liable under her second theory of recovery if its conduct rendered Ms. Eisenhut's work place unsafe—whether or not such conduct caused the accident.

Reduced to their essentials, the theories of appellant's complaint appear to be species of strict liability: ARRADCOM may be required to respond in money damages even if its "negligence" did not *cause* the accident. If they are, appellant cannot recover under the FTCA; an FTCA claimant cannot prevail unless the claimant proves that the allegedly "negligent or wrongful act or omission" actually "caused" the injury sustained. *See* 28 U.S.C. § 1346(b) (1982); *Dalehite v. United States*, 346 U.S. 15, 44–45, 73 S.Ct. 956, 972–73, 97 L.Ed. 1427 (1953).[7]

Even if we were to assume that appellant's theories of liability contain a causation element, thus requiring her to demonstrate that ARRADCOM's alleged misconduct caused the laboratory explosion, she cannot avoid summary judgment. Under Florida law, which provides the rule of decision in this case,[8] ARRADCOM had no *duty* either (1) to warn Ms. Eisenhut that the manner in which she was handling compound 119G might produce a fatal explosion, or (2) to ensure, by providing a safe place to work, that such an explosion would not occur.

## A.

Appellant cites no cases from Florida or any other jurisdiction, and we have found none, which hold that a purchaser of

---

7. Appellant cites no Florida cases, and we are aware of none, that would permit her to recover without establishing that ARRADCOM's misconduct caused the explosion. Appellant does not suggest that ARRADCOM's responsibility for the explosion has been established circumstantially under the doctrine of *res ipsa loquitur,* a doctrine obviously inapplicable on the facts here.

8. The rule of decision in an FTCA case is provided by the law of the state where the "act or omission occurred." *See* 28 U.S.C. § 1346(b) (1982). The alleged negligence in this case occurred in Florida; thus, Florida law governs.

goods from the manufacturer thereof has a duty to warn the manufacturer and its employees of any danger that may attend the manufacture of the goods—even where the goods are, as appellant alleges, "ultrahazardous" and are "inherently dangerous" to produce, and the purchaser has "superior knowledge" of such facts *and* knows, or has reason to believe, that the manufacturer lacks such knowledge.[9] Nonetheless, we have assumed, for the sake of argument, that the Florida courts would adopt a rule requiring a purchaser possessing knowledge superior to that of the manufacturer concerning the hazardous nature of the goods and the danger inherent in their production to communicate such knowledge to the manufacturer and its employees *if* the purchaser knows or has reason to believe that they lack such knowledge. And, with this assumption in mind, we have examined the record for evidence that ARRADCOM had knowledge, which it knew or had reason to believe was not possessed by ORI and Ms. Eisenhut, that the manner in which Ms. Eisenhut was handling compound 119G might cause the compound to explode. As the following discussion indicates, the inference cannot be made that ARRADCOM possessed such knowledge.

The record contains only two explanations as to the cause of the explosion; both relate to the manner in which Ms. Eisenhut was handling compound 119G. The first explanation is provided by Dr. Hal Waite, ORI's chief chemist; the other comes from the Government's expert, John Conkling, a chemist specializing in pyrotechnics. According to Dr. Waite, in a letter written to ARRADCOM a few days after the accident, static electricity, which accumulated on Ms. Eisenhut's body as she loaded the cartridges with smoke powder, ignited the powder. He said that moments before the explosion, Ms. Eisenhut was seen not wearing her "grounding Wriststat," as required by ORI's safety procedures; had she been wearing the device, the accident probably would not have occurred. Dr. Waite indicated that Ms. Eisenhut's failure to wear the device made it possible for the static electricity on her body to be transmitted to the compound, the very thing the Wriststat was designed to avoid.

John Conkling's explanation differed from Dr. Waite's. According to Conkling, the high degree of humidity present in the atmosphere at the time of the explosion made it unlikely that static electricity triggered the event; humid air, he observed, is a poor conduit for static electricity. Conkling's theory, which, unlike Dr. Waite's, is

9. Appellant cites several cases which she contends support the proposition that a purchaser of goods from the manufacturer thereof has a duty to warn the manufacturer and its employees of any danger that may attend the manufacture of the goods. They are not persuasive. Some are federal cases, applying Florida law, that relate to the duty the employer of an independent contractor may have to a *third party*, rather than to the contractor's employees. *See, e.g., Emelwon, Inc. v. United States*, 391 F.2d 9 (5th Cir.), *cert. denied*, 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968); *H.L. Properties Inc. v. Aerojet-General Corp.*, 331 F.Supp. 1006 (S.D. Fla.1971), *aff'd*, 468 F.2d 1397 (5th Cir.1972). These cases are plainly inapposite.

Other cases appellant cites relate to the duty one owes to an independent contractor he has invited onto his premises or furnished an instrumentality. *See, e.g., Scofi v. McKeon Const. Co.*, 666 F.2d 170 (5th Cir.1982); *Florida Power & Light Co. v. Price*, 170 So.2d 293 (Fla.1964). In these cases, the courts seek to determine whether the owner had knowledge, superior to that possessed by the independent contractor or its

employees, about a danger such employees faced while working on the premises or with the instrumentality. These cases, too, are inapposite. Here, the contract work was performed on ORI's, not ARRADCOM's, premises, and ARRADCOM furnished ORI no instrumentality.

Appellant cites FTCA cases not applying Florida law which, at first blush, appear to support her position. *See, e.g., Aretz v. United States*, 604 F.2d 417 (5th Cir.1979) (interpreting Georgia law), *vacated*, 616 F.2d 254 (5th Cir.1980), *reinstated*, 660 F.2d 531 (Former 5th Cir. Nov. 1981) (en banc); *Toole v. United States*, 588 F.2d 403 (3d Cir.1978) (interpreting Pennsylvania law). A careful reading of those cases reveals, however, that the duty imposed on the Government was grounded in contract; by contract, the Government assumed a duty to provide safe working conditions for its contractors' employees. Such is not the case here; the December 12 purchase order imposed no express duty on the Government to provide Ms. Eisenhut a safe place to work, and as explained in Part II.B. of this opinion, Florida law did not imply such a duty.

based on possibility rather than probability, is that the explosion occurred as Ms. Eisenhut, using a metal scoop, was removing compound 119G from a one-quart container, which contained 200–300 grams of the powder, so that she could measure the compound into 10.5 gram portions for insertion into the cartridges.[10] The movement of the scoop through the powder created friction which may have produced heat sufficient to ignite the powder. Conkling stated that the ignition of 200–300 grams of 199G in a one-quart container could easily produce a catastrophe of the magnitude of the one in this case. According to Conkling, at the time of the accident, it was well known in the pyrotechnics industry that the ingredients of 119G, blended pursuant to ORI's formulation, were "prone to accidental ignition" and were "quite energetic"; moreover, in a powder state, they were in their "most sensitive and energetic form." Conkling added that any pyrotechnic specialist of Dr. Waite's qualifications and experience would have known this.

The record indicates that ARRADCOM, ORI, and Ms. Eisenhut knew the following about the static electricity problem described by Dr. Waite and the friction-heat problem discussed by Conkling. With respect to the first problem, ARRADCOM knew before it gave ORI the purchase order on December 12, 1979 that ORI would require the employee processing the order to wear conductive shoes and a Wriststat grounding device when working with the 119A and G compounds. ARRADCOM learned this when its safety inspector examined ORI's plant on August 2, 1979,[11] and Dr. Waite showed him how the smoke powder would be handled. A reasonable trier of fact could infer from this that ARRADCOM was aware from the outset that static electricity posed a safety problem. At the same time, ARRADCOM must have had good reason to believe that ORI would invoke appropriate safety procedures to eliminate the problem. Dr. Waite apparently gave ARRADCOM's inspector sufficient assurances in this regard, because the inspector advised his superiors that ORI could produce the smoke powder in a safe manner.

ORI and Ms. Eisenhut knew as much if not more than ARRADCOM about the danger posed by static electricity. Both knew that static electricity could ignite the smoke powder and cause it to explode with lethal force. To avoid this risk, ORI had a safety regulation that required Ms. Eisenhut to wear conductive shoes and a grounding device, the Wriststat, on her wrist while handling smoke powders. That Ms. Eisenhut was aware of this requirement and its purpose there can be no doubt. A couple of weeks before the accident, one of her superiors caught her working with compound 119G without her Wriststat on and gave her a strong reprimand; he reminded her that if static electricity came into contact with the powder, it could trigger an explosion violent enough to kill her. Inexplicably, Ms. Eisenhut repeated her mistake a few days later, and she died as a result.

With respect to the friction-heat problem, the record contains nothing. No evidence has been presented suggesting that ARRADCOM knew anything about this problem; the same is true regarding ORI and Ms. Eisenhut.

In sum, the record before us firmly precludes the inference, on summary judgment, that ARRADCOM had "superior knowledge," which it had a duty to communicate to ORI and Ms. Eisenhut, concerning the hazards that could have triggered the explosion in this case.[12] Thus, even if the

---

10. See supra note 1.

11. ARRADCOM examined ORI's plant on August 2, 1979 as part of its inspection of Dayron Corporation's facilities. At the time, ARRADCOM contemplated contracting with Dayron to produce both the smoke powder and the fuzes; Dayron, in turn, planned to have ORI produce the smoke powder under a subcontract. Before deciding whether to contract with Dayron, AR-RADCOM conducted a routine "pre-award survey" of the facilities of both companies.

12. In her brief on appeal, appellant cites two internal memoranda written by Ronald Nitzsche, assistant to the chief of ARRADCOM's Tube Fired Fuze Branch which had performed laboratory tests on compounds 119B and C. Appellant contends these memoranda establish ARRADCOM's superior knowledge or at least

Florida courts would accept appellant's duty to warn theory of recovery, her claim fails.

### B.

■ Appellant's second theory is that ARRADCOM voluntarily assumed ORI's obligation to provide Ms. Eisenhut a safe place to work, failed to make such provision, and therefore caused her death. Appellant contends that ARRADCOM assumed this obligation because ARRADCOM (1) inspected the safety of ORI's production facilities and determined that they were safe before it gave ORI the purchase order for the 119A and G cartridges; (2) monitored ORI's performance of the contract to ensure that ORI complied with its terms; and (3) if it observed an unsafe condition in the work place, had a contract right to order ORI to eliminate the condition or, if necessary, cease further performance of the contract work.

The Florida courts would not recognize a' duty to provide a safe place to work in the circumstances at hand. *See Skow v. Department of Transp.*, 468 So.2d 422 (Fla. Dist.Ct.App.1985); *see also Swartz v. Ford, Bacon & Davis Constr. Corp.*, 469 So.2d 232, 233 (Fla.Dist.Ct.App.1985). *Skow* is squarely on point. There, the First District Court of Appeal, affirming a summary judgment, rejected the precise argument appellant presents in this case. We quote at some length from the court's opinion.

Timmy Skow, an employee of Capelletti Brothers, Inc., was injured while working on a bridge being constructed under a contract between Capelletti Brothers (Capelletti), the contractor, and the Department of Transportation (DOT). Skow was working high above the river without a safety belt when he lost his footing, slipped, and grabbed a pile driver, which crushed his hand. He and his wife ... appeal a final summary judgment for DOT on their claim for personal injury damages. We affirm.

Appellants argue that DOT owed Timmy Skow a legal duty to eliminate unsafe working conditions that it knew or should have known would expose workers to a substantial risk of harm. Notwithstanding the general rule that one who hires an independent contractor is not liable for injuries sustained by that contractor's employees in their work, *Van Ness v. Independent Construction Co.*, 392 So.2d 1017 (Fla. 5th DCA 1981), appellants argue that a legal duty arose because DOT assumed such detailed con-

---

preclude summary judgment. We are not persuaded.

On December 6, 1979, six days before ARRADCOM issued the purchase order Ms. Eisenhut was working on when the accident occurred, Nitzsche wrote to ARRADCOM personnel responsible for the practice mortar round project and stated that compounds 119B and C "are considerably more sensitive than the ARRADCOM smoke" (presumably a smoke powder ARRADCOM's chemists had developed), and recommended that "[i]n the interest of maximum troop safety," ARRADCOM not purchase either compound from ORI.

In a January 15, 1980 memorandum, written before the Tube Fired Fuze Branch submitted compound 119G to laboratory analysis, Nitzsche opined that by using perchlorates instead of nitrates in making compound 119G, ORI had minimized the possibility of phosphine gas formation. Nitzsche added, however, that the perchlorates "should increase the sensitivity [of compound 119G] over the previous compositions [i.e., 119B and C] which are already considered overly sensitive for the proposed practice fuze applications [and are] extremely sensi-

tive and hazardous for use in practice ammunition." Nitzsche questioned, in passing, whether any of ORI's smoke powders could be "manufactured and loaded into practice items under high volume conditions without risk of catastrophic fire and/or explosion" and "strongly recommend[ed] that the ORI Composition be abandoned in favor of the ARRADCOM Composition."

Fairly read, Nitzsche's memoranda express two concerns: ORI's compounds might present an undue hazard to the troops in the field and to those involved in their manufacture under "high volume conditions." The only explanation Nitzsche gave for his opinion is that ORI's compounds were "overly sensitive for the proposed practice fuze applications" and "extremely sensitive ... for use in practice ammunition." The memoranda reveal nothing about the manner in which ORI had been manufacturing its compounds or processing ARRADCOM's purchase orders. Nor do they reveal that ARRADCOM knew of the static electricity and friction-heat problems, described by Dr. Waite and John Conkling, which are the only explanations of the explosion contained in the record before us.

trol over the work that the independent-contractor relationship between DOT and Capelletti ceased to exist. Additionally, appellants assert that Timmy Skow's work was inherently dangerous, that he was allowed to work without a safety belt, and that DOT breached its duty to enforce the requirements of the Capelletti/DOT contract and federal safety regulations by failing to require Capelletti to provide bridge workers with safety belts.

The undisputed facts in the record support the conclusion that although DOT actively participated in the inspection of work done by Capelletti, this was done only to ascertain the results of the work and not to control the method of performance or to ensure Capelletti's compliance with safety regulations. DOT provided supervision only in the sense that its inspectors generally observed the work for compliance with the contract. The several instances of specific instruction given by DOT employees to Capelletti's employees constituted general supervision in this sense and did not amount to an exercise of control by DOT that is legally sufficient to take this case out of the general rule of *Van Ness, supra.*

Although the contract provided that Capelletti would comply with all applicable state and federal laws governing safety and provide safeguards and safety equipment for its employees, and provided that DOT had authority to shut down the job site for Capelletti's breach of this requirement, the contract did not impose an explicit duty on DOT to monitor, inspect, and correct violations by Capelletti. There is no indication in this record that DOT, as owner, created or contributed to the dangerous condition alleged to have caused Timmy Skow's injuries.

Since appellants' cause of action is not predicated on a showing that "the contracting owner by positive act of negligence or negligent omission on his part caused injury" to the independent contractor's employee, *Florida Power & Light Co. v. Price,* 170 So.2d 293, 297 (Fla.1964), no duty, delegable or nondelegable, was owed by DOT to Timmy Skow. *Ibid.; Conklin v. Cohen,* 287 So.2d 56 (Fla.1973); *Van Ness v. Independent Construction Co., supra.*

*Skow,* 468 So.2d at 423–24.

*Skow* disposes of every material aspect of appellant's argument that ARRADCOM assumed ORI's duty to provide Ms. Eisenhut a safe place to work.[13] Accordingly, her argument fails.

### III.

In summary, appellant's claim that AR-RADCOM owed Ms. Eisenhut a duty which it breached, thus causing her death, is without merit. The judgment of the district court is therefore

AFFIRMED.

---

**13.** In her memorandum to the district court in opposition to ARRADCOM's motion for summary judgment and in her brief to us, appellant suggests that ARRADCOM was liable because it "negligently" failed to put a provision in the purchase order for the cartridges requiring ORI to comply with the Department of Defense "Contractors' Safety Manual for Ammunition, Explosives, and Related Dangerous Material." The provision would have required, among other things, that ORI make Ms. Eisenhut do exactly what ORI's safety procedures mandated, i.e., wear conductive shoes and other grounding devices. Appellant reasons that if ARRADCOM had inserted this provision in the purchase order, ORI would have given Ms. Eisenhut's work closer scrutiny and the accident would not have occurred. Appellant cites no authorities from Florida or elsewhere that would hold that AR-RADCOM owed Ms. Eisenhut a duty to insert the provision in the purchase order, and we have no reason to believe that the Florida courts would reach such a holding.

The district court rejected this particular allegation of negligence on the ground that the alleged act of misconduct constituted a discretionary act which is not actionable under the "discretionary function exception" of the FTCA. *See* 28 U.S.C. § 2680(a) (1982). In view of our disposition, we need not reach this discretionary function issue.